## Gipson v. Commonwealth.

(Decided September 28, 1926.)

### Appeal from Jackson Circuit Court.

Homicide—In Prosecution of Peace Officer for Manslaughter, Failure to Instruct as to Defendant's Rights and Duties as Officer Held Error, where he was Attempting to Arrest Deceased at Time

of Killing (Ky. Stats., Section 1148a-7).—In prosecution of peace officer for manslaughter, in which defendant testified that he shot deceased when latter attempted to prevent arrest for disturbing peace and possessing liquor, failure to instruct as to defendant's rights and duties as officer held error, in view of Ky. Stats., section 1148a-7.

LEWIS, BEGLEY & LEWIS for appellant.

FRANK E. DAUGHERTY, Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Reversing.

Jack Gipson appeals from a conviction for manslaughter fixing his punishment at twenty-one years in the penitentiary, the principal ground urged for reversal being error in instructions.

The homicide occurred on the evening of October 12, 1924, on the public highway near a church and not far from the residence of Will Lakes. Gipson, who lived in a different neighborhood, was at the logging camp of the Bond-Foley Lumber Company in the afternoon, conversing in a social way with the employees of that company, and invited the deceased, Oren Lakes, and others to attend church that evening. Before time for the meeting he started in that direction in company with Jim Robbins and someone else whose name is not given. Later the deceased, Oren Lakes, and Will Hundley started in the same direction and overtook Gipson and Robbins, who were in company with some others on the roadside, drinking sweet cider, in which they all joined. Will Hundley testifies that Jack Gipson and Oren Lakes went around a turn in the road; that he stepped forward to see what they were doing and found them in a quarrel of some kind, though he could not understand what they were saying; that the moon was shining but Lakes was in the shadow of a tree; his hands were down and witness did not see him do anything, but Gipson shot Lakes with a pistol and ran up the road. Witness called others and carried the wounded man to the house of Louis Lakes, where he remained during the night; on the following day he died while on the way to the hospital; that neither he nor Lakes was intoxicated and that Lakes had not drunk any liquor so far as he knew; that he threw up after he was shot and that there was no odor of liquor from this.

John Clemmons testifies that he passed the crowd on his way to church; that there were present the deceased Oren Lakes, Jack Gipson, Will Hundley, Jim Robbins and others; that they were laughing and talking and pulling each other around; that he said, "Let's go to church," and some of the parties started with him but left Lakes, Gipson and Hundley; that about five or six minutes afterward he heard two pistol shots and Will Hundley came running down the road saying that Gipson had shot Lakes. George Shepherd's evidence is similar except that he says the parties were fussing, staggering and pulling at each other as they passed. Other nearby witnesses who did not see the difficulty testified that the parties were cursing and quarreling and that they heard Jack Gipson's voice. Louis Lakes testifies that he sold Jack Gibson some nonintoxicating sweet cider once early in the afternoon and twice in the late evening just before the homicide. After the shooting Gipson came to his house with a Colt's pistol in his hand, saying that the pistol had hung up on him; that witness examined the pistol and it did not work.

The defendant testified that he was a constable of Jackson county; that he was visiting his daughter, whose husband worked at the lumber camp, and had carried her some eggs in a bucket; that he purchased some sweet cider of Louis Lakes which he found palatable; that he spent the afternoon around the logging camp and did ask the boys if they were going to meeting that night; that about church time he and Jim Roberts started to church; that he had his bucket with him and purchased some more cider from Louis Lakes with which he treated the others; that they stopped along the road and drank this and learned that the meeting was not to be held; while there he was overtaken by deceased, Oren Lakes, and Will Hundley, who joined the party; Hundley and Lakes were intoxicated and swearing and using obscene language; that he went up to stop them; that they were facing each other, each with his left hand on the other's shoulder and drinking from a bottle of whiskey; he told them that he was an officer and must preserve the peace and that he would have to arrest them for disturbing the peace and having intoxicating liquor in their possession; that Lakes said, "I will drink whiskey when I please and when I G— d— please. What have you got

to do with it?" That both Lakes and Hundley grabbed him, Hundley saying, "Where is that good pistol? take it away from him," and running his hand under the bib of his overalls to get the pistol, which was in a holster. At the time Lakes was holding defendant's left arm but was on his left side and rather to his back; that he jerked his pistol and threw it over his left shoulder or around his left side and fired; at that time Oren Lakes had him by the throat and was choking him, and just before he shot, one of them said, "Kill him, G— d— him." When he fired he felt Lakes fingers loosen from his throat but that one of the parties struck him on the back of the head with some hard substance and knocked him to his knees and that he raised and fired a second shot and then ran down the road; that Lakes was younger, much larger physically and stronger than he and had the reputation of being a dangerous man when drunk; at the time he fired the shot he believed his life was in danger; that he was on friendly terms with all of the parties, and this fact seems to be admitted.

The court gave the usual instructions, including that of self-defense, but did not instruct the jury as to the rights and duties of appellant as an officer, which seems to have been his principal defense. Epitomized, his evidence is to the effect that he was a duly elected and qualified peace officer; that two public offenses were being committed in his presence, for which he attempted to arrest the offenders, who by violence and threats sought to obstruct and intimidate him in the performance of his duty. If his statements are true it was his duty in the first instance to arrest the offenders for the misdemeanors thus committed. In doing this he was authorized to use only such force as was reasonably necessary to accomplish that purpose, not to endanger life or limb; but if while in the discharge of that duty the offenders sought by violence, force or threats to intimidate and obstruct him in the performance of such duty they were committing a felony in his presence for which he was authorized to arrest them and to use such force as might be necessary for that purpose, it being specifically provided in section 1148a-7, Ky. Statutes, that "it shall be unlawful for any person or persons . . . by violence, force or threats to alarm, disturb or hinder or obstruct or intimidate any officer of the Commonwealth of Kentucky in the matter of his official action or in the discharge of his duty or attempt so to do . . . ;" the

punishment fixed being confinement in the penitentiary. It was error not to instruct on this theory of the case, as it is well settled that it is the duty of the court to give the whole law of the case, and this includes every defense offered by the accused. We find no merit in the other questions raised by appellant.

Wherefore, the judgment is reversed and cause remanded for proceedings consistent with this opinion.